UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:08-CV-89-F

| HENRY D. MCLAURIN and MILLIE D. MCLAURIN, | ) |  |
|---|---|---|
| Plaintiffs, | ) |  |
|  | ) |  |
| vs. | ) | ORDER |
|  | ) |  |
| EAST JORDAN IRON WORKS, INC., , VULCAN THREADED PRODUCTS, INC., and GRAND RAPIDS BOLT AND NUT, INC. d/b/a GREAT LAKES FASTENERS, | ) |  |
| Defendants. | ) |  |

This matter is before the court on Plaintiffs' Motion to Reconsider [DE-35] the court's April 9, 2009, Order; Defendant East Jordan Iron Works, Inc.'s Motion for Leave to Amend Answer [DE-39], and the motions for summary judgment filed by Defendants Vulcan Threaded Products [DE-41] and Defendant Grand Rapids Bolt and Nut, Inc. [DE-42]. All motions are ripe for ruling.

## I. PROCEDURAL HISTORY

Plaintiffs Henry D. McLaurin ("Mr. McLaurin) and Millie D. McLaurin ("Mrs. McLaurin") initiated this action by filing a complaint in the Superior Court of Sampson County, North Carolina on January 22, 2008. The action was removed to this court on March 4, 2008.

On February 13, 2009, Defendants filed a joint motion [DE-27] to strike as experts Bill W. Hong and Andrew Preiss, and to strike the expert report of Wong. In an order filed on April 9, 2009, the Hon. David W. Daniel, United States Magistrate Judge, denied the motion to strike Hong as an expert and to strike his report, but allowed the motion to strike Preiss as an expert. In

so ruling, Judge Daniel noted that Defendants represented that Plaintiffs failed to produce Preiss's expert report and failed to make him available for a deposition. Judge Daniel also noted that Plaintiffs' response to the motion to strike made no mention of Preiss.

On June 4, 2009, almost two months after Judge Daniel's order striking Preiss as an expert, Plaintiffs filed the Motion to Reconsider the April 9, 2009, Order. On July 10, 2009, Defendant East Jordan Iron Works, ("East Jordan"), filed a Motion for Leave to Amend its Answer in order to assert additional affirmative defenses. Defendants Vulcan Threaded Products, Inc. ("Vulcan") and Grand Rapids Bolt and Nut, Inc., d/b/a Great Lakes Fasteners ("Great Lakes") filed their respective Motions for Summary Judgment on August 3, 2009. Plaintiffs filed a Notice of Voluntary Dismissal against East Jordan on August 19, 2009.

## II. STATEMENT OF THE FACTS

At the time of the events giving rise to this action, Mr. McLaurin was working as a civilian, non-uniformed employee for the United States Department of Defense ("USDOD"). Specifically, on December 22, 2005, Mr. McLaurin was working as a telecommunications splicer on Fort Bragg in North Carolina.

As part of his duties, Mr. McLaurin was required to enter a manhole just outside the Fort Bragg main gate. To do so, Mr. McLaurin had to remove the manhole cover by inserting a lifting bar under the horizontal portion of a U-shaped drop handle[1], or "U-bolt" attached to the cover. As Mr. McLaurin began to pull up on the lifting bar in an effort to remove the manhole cover, the horizontal portion of the U-bolt sheared off from the two vertical portions and broke away,

---

[1] The parties refer to the U-shaped drop handle as the "U-bolt," "square bent U-bolt" or "drop handle." It is a U-shaped threaded rod that is attached to the manhole cover and forms the handle. There were two u-shaped drop handles on the manhole cover in question.

causing Mr. McLaurin to full backwards and suffer personal injuries. Mr. McLaurin represents that since the incident, he has had two surgeries on his knee and one on his shoulder, and has developed a blood clot in his leg due to the surgeries.

McLaurin contends that East Jordan had a contract to supply the USDOD with manhole covers. According to Grand Rapids, East Jordan submitted specifications for the U-bolts to Grand Rapids. The specifications sent by East Jordan did not include a "sampling plan"–an industry term for a request from the client that a specified percentage of the U-bolts be inspected or tested. Upon receipt of the specifications from East Jordan, Grand Rapids forwarded the specifications to Vulcan to obtain a quotation for the manufacturing of the U-bolts. Once Grand Rapids received a quotation from Vulcan, it forwarded its own quotation to East Jordan. East Jordan approved the quotation, and then placed a purchase order with Grand Rapids for a specified number of U-bolts. Grand Rapids then placed a purchase order with Vulcan.

The parties all agree that Vulcan did not utilize heat in the manufacturing process of the U-bolts. Vulcan contends it did not do so because (1) it was not asked to do so and (2) it did not have the capacity to heat products in the manufacturing process. Instead, it used a cold-bending process, and did not heat the U-bolts at all.

Upon receipt of the manufactured U-bolts from Vulcan, Grand Rapids checked a sampling of the U-bolts to confirm that the dimensions were consistent with the East Jordan specifications, to check that the thread was appropriate, and to confirm that the quantities sent were correct. Grand Rapids then forwarded the U-bolts to East Jordan without any alteration or modification of the U-bolts. Grand Rapids contends that where a buyer's specifications do not include a sampling plan, it is industry standard for a seller to confirm only the quantity and

dimensions of a product before forwarding to the buyer. Upon receipt of the U-bolts, East Jordan put the U-bolts on the manhole covers.

After this case was initiated, Plaintiffs engaged the services of a metallurgist, Bill Wei Hong. In his deposition, Mr. Hong testified that it was his opinion that the deficiency in the bolt was the combination of (1) a preexisting, microscopic crack within the U-bolt and (2) the material becoming embrittled as evidenced by intergranular features within the U-bolt. Mr. Hong stated that galvanizing material was found inside the crack, which indicated that the preexisting crack formed during the manufacturing process prior to the point in time when the bolt was galvanized. He also opined that the embrittlement occurred during the manufacturing process. Mr. Hong testified that the crack was most likely created during the "bending process" for the U-bolt. Although Mr. Hong testified that there was nothing wrong with the "cold bending" technique Vulcan used to manufacture the U-bolt, he did state that if Vulcan had applied stress-relief heat treatment after the bending process, the crack would not have been created. He did admit, however, that he was unaware of the "industry standard" for companies that manufacture threaded rods such as the U-bolt.

Mr. Hong also testified that the galvanizing process coated the bolt and effectively hid the preexisting crack from detection and that neither the preexisting crack nor the embrittlement could have been visually detected. Indeed, Mr. Hong testified that he was only able to detect it by dissecting the bolt with a "band saw or an abrasive wheel" and inspecting the pieces under a microscope–effectively destroying the U-bolt. When asked whether he knew the industry standard for a company that distributes U-bolt to inspect products in its possession, he answered:

> No, I don't know. But usually, you know, they would – for any critical part, for critical applications, they will do nondestructive testing, such as ultrasonic, liquid penetrant or mag particle, but that's for, you know, very critical applications like aerospace. There are no microcrack[s] allowed. Our lab do [sic] that, too: Nondestructive testing.
> For this kind of application, I don't know what the – what the requirement is.

Grand Rapids Mem., Dep. of Bill Wei Hong [DE-44-4] at p. 85. Counsel then asked: "You would agree with me U-bolts for manhole covers are not critical like aerospace and sending a shuttle into space?" *Id.* Mr. Hong answered:

> I don't know. But obviously the aerospace component have much, much more stringent requirement just from my experience. Our lab do aerospace, do medical equipment, and do fasteners.
> For any fasteners, that hydrogen embrittlement, that's a major concern. And the stress corrosion cracking and liquid metal embrittled, that's a major concern for this industry.

*Id.* at pp. 85-86. Mr. Hong never addressed in his report, or his deposition testimony, what methods should have been used to inspect the U-bolts.

### III. MOTION TO RECONSIDER

Plaintiffs ask the court to reconsider its April 9, 2009, Order striking Andrew Preiss as an expert.[2] Plaintiffs contend that they had disclosed Preiss's expert report before litigation began and that Defendants had the opportunity to depose Preiss prior to Judge Daniel ruling on the Motion to Strike. Plaintiffs contend that it is excusable that they neglected to address Preiss in their response.

---

[2] The parties reference Rule 60 of the Federal Rules of Civil Procedure. Rule 60 only becomes applicable after a final judgment has been entered in a case. *See Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir. 1991)(explaining that Rules 59(e) and 60(b) are only available for relief from a final judgment). A court, however, may revisit interlocutory orders at any time prior to final judgment pursuant to Rule 54(b) or its inherent authority and is not confined by Rule 60's requirements. *Id.* at 1472.

Defendants oppose the motion to reconsider, contending they made no misrepresentations to the court in the Motion to Strike. Defendants also assert that although they did get to depose Preiss, they had to unilaterally notice the deposition due to Plaintiffs' failure to provide amenable dates to take Preiss's deposition, and they scheduled the deposition out of an abundance of caution because the discovery period was scheduled to close on March 6, 2009.

The court concludes that in this context, Plaintiffs' motion must be DENIED. Plaintiffs offer no explanation as to why they waited almost two months to ask the court to reconsider its motion, nor do Plaintiffs explain why they neglected to respond to Defendants' arguments about Preiss when the Motion to Strike was pending. Generally, "motions to reconsider are not appropriate vehicles to advance arguments already rejected by the Court or new legal theories not argued before the ruling." *Zurich Capital Markets, Inc. v. Coglianese*, 383 F. Supp. 2d 1041, 1045 (N.D. Ill. 2005). Consequently, " 'a party who fails to present his strongest case in the first instance generally has no right to raise new theories or arguments in a motion to reconsider' " an interlocutory order. *United States v. Duke Energy Corp.*, 218 F.R.D. 468, 474 (M.D.N.C. 2003)(quoting *Fidelity Stat Bank, Garden City, Kan. v. Oles*, 130 B.R. 578 (D.Kan. 1991)). Accordingly, the court declines to entertain Plaintiffs' new arguments and their motion to reconsider is DENIED.

### IV. MOTION TO AMEND

On July 10, 2009, East Jordan filed a Motion for Leave to Amend Answer [DE-39], seeking to assert additional affirmative defenses. Since filing that motion, however, East Jordan and Plaintiffs have filed a Stipulation of Dismissal as to Plaintiffs' clams against East Jordan. Consequently, East Jordan's Motion for Leave to Amend [DE-39] is DENIED as moot.

# V. MOTIONS FOR SUMMARY JUDGMENT

## A. Standard of Review

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-movant. *Liberty Lobby*, 477 U.S. at 255. Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish any one of the essential elements of the party's claim on which he will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322-23.

## B. Claims Against Vulcan

Vulcan, the manufacturer of the U-bolts, argues that both Mr. McLaurin's claim for negligence and his claim for breach of implied warranty must be dismissed.

### 1. Breach of Implied Warranty

Vulcan contends that Mr. McLaurin's claim for breach of implied warranty must fail, arguing *inter alia,* lack of privity. Under North Carolina law, "[p]rivity via a contractual relationship between the plaintiff and the seller or manufacturer of an allegedly defective product is required to maintain a suit for breach of implied warranty, 'except where the barrier of privity

has been legislatively or judicially removed.'" *Nicholson v. American Safety Utility Corp.*,124 N.C. App. 59, 68, 476 S.E.2d 672, 678 (1996)(quoting *Crews v. W.A. Brown & Son*, 106 N.C. App. 324, 331, 416 S.E.2d 924, 929 (1992)). In product liability actions where the action is brought "for or on account of personal injury, death, or property damage caused by or resulting from the manufacture . . . marketing [or] selling . . . of any product", N.C. Gen. Stat. § 99B-1(3), the North Carolina General Assembly has removed the privity requirement in certain enumerated instances. Specifically, Section 99B-2(b) provides:

> A claimant who is a buyer, as defined in the Uniform Commercial Code, of the product involved, or who is a member or a guest of a member of the family of the buyer, a guest of the buyer, or an employee of the buyer may bring a product liability action directly against the manufacturer of the product involved for breach of implied warranty; and the lack of privity of contract shall not be grounds for dismissal of such action.

Vulcan argues, for the first time in its Reply [DE-54], that because the facts of this case do not fit within any of legislative exceptions to the privity requirement, Mr. McLaurin's claim for breach of implied warranties must fail.

Under the express terms of Section 99B-2(b), Mr. McLaurin can maintain an action for breach of implied warranties only against a manufacturer, and only if he is a buyer of the product in question or an employee of the buyer. There is no allegation that Mr. McLaurin was a buyer of the manhole cover. McLaurin alleges that his employer, the USDOD, was a buyer of the manhole cover, *see* Compl. [DE-1-3] at ¶ 15, but the record before the court does not contain evidence supporting this allegation,[3] perhaps because Vulcan first raised this issue in its Reply.

---

[3] Mr. McLaurin does argues that North Carolina law allows "any foreseeable user" to state a claim for breach of warranty, but his contention holds true only for claims based on inadequate warning or instruction for a product. *See* N.C. Gen. Stat. § 99B-5. In the response to the motion for summary judgment, Mr. McLaurin does not indicate that any of the defendants

8

Accordingly, Mr. McLaurin is directed to file a sur-reply, within seven (7) days of the filing date of this order, proffering evidence from which the jury could find that Mr. McLaurin's employer purchased the manhole cover in question. The court reserves ruling on Vulcan's motion for summary judgment on Mr. McLaurin's claim for breach of implied warranty pending the receipt of Mr. McLaurin's sur-reply.

### 2. Negligence claim

Vulcan also contends that Mr. McLaurin's claim for negligence must be dismissed because he has not introduced sufficient evidence of the relevant standard of care for manufacturing U-bolts, nor evidence that Vulcan violated the standard of care. Specifically, Vulcan contends that the affidavit of Bill Buckner, the Sales Manager for Vulcan, establishes the "industry standard" of care, and that Mr. McLaurin's proffered expert has failed to opine on the standard of care, or, if he has, his opinion should be disregarded because it is inconsistent with his deposition testimony. Vulcan's arguments raises two separate issues: (1) whether the court should consider Mr. Hong's affidavit when ruling on the motion for summary judgment; and (2) whether Mr. Hong's testimony constitutes evidence of the relevant standard of care.

### a. Hong's affidavit

It is well-settled that a party cannot create a genuine issue of material fact by submitting an affidavit with statements that directly contradict the affiant's previous sworn deposition testimony. *Rohrbough v. Wyeth Lab., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990). In *Rohrbough*, the Fourth Circuit held that the district court was justified in disregarding an expert's affidavit where the expert refused, when being questioned in his deposition, to give an opinion as to

---

failed to issue adequate warnings or instructions.

whether a causal link existed between a vaccine and the plaintiff's injuries, but later stated in an affidavit that the vaccine did cause the injuries in question. *Id.* The Fourth Circuit opined that given the differences between the expert's affidavit and deposition testimony, "the district court was left not with a genuine issue of material fact, but with trying to determine which of several conflicting versions of [the expert's] testimony was correct." *Id.* at 976. Both the district court and the Fourth Circuit felt the affidavit "may not represent the considered opinion of the doctor himself, but rather an effort on the part of the plaintiffs to create in issue of fact." *Id.* The Fourth Circuit has since cautioned that "for the rule in *Rohrbough* to apply, there must be a bona fide inconsistency." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 186 n.7 (2001).

In response to the motions for summary judgment, Plaintiffs submitted the affidavit of Mr. Hong, wherein he averred:

> 18. Cracks in bent metal can be detected by various methods, including X-rays, liquid penetrant examination, magnetic particle inspection, and microscopic examination. Liquid penetrant or magnetic particle inspection is a fast, cheap and effective way of detecting cracks in metals and is frequently used in industry. As stated in my deposition, these methods are more likely to be used in aerospace or other highly critical applications but could easily have been employed here.
> 19. The U-bolt or drop handle involved in this case was intended for use in the way Mr. McLaurin attempted to use it. In my professional opinion, the metal should have been stress relief heat-treated after bending and /or dipping to release tension and lessen embrittlement. At a minimum the bolt should have been inspected for cracks after bending; unfortunately the existing cracks got filled in with liquid metal and hence became essentially undetectable. Once the cracks got filled with metal it would have been extremely difficult to detect them with standard manufacturing processes except by cutting the bolt into two.

Aff. of Bill Wei Hong [DE-50-2].

With regard to the manufacturing process, the court finds that the affidavit does not contradict Mr. Hong's previous deposition testimony. In his deposition, Mr. Hong was asked if he had any opinions about the manufacturing process, and he answered: "I think that the stress relief for the heat treatment should be performed after cold–after bending process." Dep. of Bill Hong [DE-44-4] at p. 51. *See also id.* at p. 32-33 (explaining that if the bending process had been followed by a stress-relief heat treatment, it would have helped to prevent the crack from forming). Consequently, with regard to the manufacturing process itself, Mr. Hong's affidavit is consistent with his deposition testimony.

Vulcan, however, urges the court to consider both that Mr. Hong admitted that he did not know the "industry standard" for companies that manufacture threaded rods, and the following exchange:

> Q.   ... And Mr. Kessler asked you about one defendants in this matter, and there are defendants in this matter: East Jordan Iron Works, Vulcan Threaded Products, and Grand Rapids Bolt and Nut. Do you have any opinions regarding any of those three defendants?
>
> A.   No.

Dep. of Bill Hong [DE-44-4] at p. 90-91. The court does not feel that this answer renders Mr. Hong's affidavit testimony about the manufacturing process contradictory. Rather, the exchange must be read in the context of the entire deposition testimony. Earlier in the deposition, Mr. Hong had the following exchange with counsel for East Jordan:

> Q:   Okay. Do you know who East Jordan Manufacturing Company is?
> A:   No, I'm not familiar with the manufacturer.
> Q.   Do you have any opinions as we sit here today of anything that East Jordan has done incorrectly?
> A.   No, I have no idea. I–I–I know nothing about this company. All the part–all the observations is based on the actual part–

11

> Q. Okay.
> A. I received.

Dep. of Hong [DE-44-4] at pp. 79-80. Consequently, when read in light of the entire deposition, it appears that Mr. Hong lacked an opinion as to the defendants individually, perhaps because of a lack of knowledge about their role in the manufacture of the U-bolt and manhole cover. Mr. Hong had a definite opinion, however, as to what would have prevented the crack: applying heated stress relief treatment.

With regard to what inspections should have been performed, however, Mr. Hong's affidavit does contradict his deposition testimony. Whenever Mr. Hong was asked if there was anything improper with how the U-bolts were manufactured, he repeatedly stated that a stress-relief heat treatment should have been applied after the cold-bending process. He never stated, however, what minimum inspection efforts should have been undertaken. Indeed, he admits that he does not know what type of inspections should have been performed. Dep. of Bill Hong [DE-44-4] at p. 85. He does detail nondestructive testing methods used in the aerospace industry, but does not state that these methods should have been used here, or give his opinion on any other minimal inspection efforts. *Id.* at pp. 85-86. He never mentions that, at minimum, the bolts should have been physically inspected for cracks, or that these other "nondestructive testing" methods should have been employed–or that they could have been "easily employed– even when asked if he had any other opinions that he had not discussed. *Id.* at p 92. Notably, his report also makes no mention of what testing or inspection efforts should have been employed. When now faced with his affidavit detailing what "minimum" testing and inspection efforts should have been undertaken, the court is left with the impression Mr. Hong's statements about

inspection and testing in the affidavit may represent "an effort on the part of the plaintiffs to create an issue of fact." *Rohrbough*, 916 F.2d at 976. Accordingly, the court disregards Mr. Hong's affidavit testimony on what inspection and testing efforts should have been used by Defendants.

### b. Standard of care

Even if the court considers Mr. Hong's affidavit testimony with regard to heated stress-relief treatment, the court still concludes that Plaintiffs have failed to proffer sufficient evidence on the relevant standard of care.

Vulcan proffers the affidavit of Bill Buckner, who averred:

> I have extensive knowledge about the manufacturing process of threaded rod products at Vulcan and other similarly situated manufacturers. I am not aware of any threaded rod manufacturer that utilizes heat in the manufacturing process of this or similar U-shaped bolts. It is the industry standard to make this particular part of similar U-shaped bolts through one of two cold-bending techniques.

Aff. of Bill Buckner [DE-43-2] at ¶ 8. Vulcan notes that Mr. Hong admitted in his deposition that he did not know the "industry standard." Now, to be sure, Vulcan cannot repeat, as a mantra, that it has proffered the only testimony as to the "industry standard" and expect to be granted summary judgment on the negligence claim. *See* 57 Am. Jur. 2d *Negligence* § 165 (explaining that "[e]vidence of the accepted customs and practices of a trade or industry does not conclusively establish the legal standard of care" and "does not preclude a finding of negligence where a reasonable person engaged in the industry would have taken additional precautions under the circumstances"). Still, Mr. McLaurin must come forward with evidence that suggests what a reasonable person would do in similar circumstances. *See Nicholson*, 124 N.C. App. at 64-65, 476 S.E.2d at 676 (explaining that an essential element of a products liability action predicated

upon negligence is "evidence of a standard of care owed by the reasonably prudent person in similar circumstances").

Here, Mr. Hong testified that he believed that a stress-relief heat treatment should be performed after the cold bending process. He did not, however, offer any context from which a jury could conclude that a reasonable person would have used a stress-relief heat treatment under these circumstances. In any negligence action, a plaintiff may argue that if the defendant had only done something differently, the plaintiff's injuries would not result. What matters, however, is not just whether something different could have been done; rather, what matters is whether a reasonable person in similar circumstances would have done something different. In other words, Mr. McLaurin must proffer evidence that would support a jury finding that a reasonable person in similar circumstances to Vulcan would have applied a heated stress relief treatment.

Mr. Hong's deposition testimony and affidavit, which is the sole evidence upon which Mr. McLaurin relies, does not include information as to whether other similarly situated manufacturers use the heated stress-relief process, the cost of using such a process, or whether it is feasible for a manufacturer like Vulcan to use the process. Although he testified that it was a "common practice", Mr. Hong could not name any other products where the heated stress-relief treatment is used. Dep. of Bill Hong [DE-44-4] at pp. 51-52. Without such context, a reasonable juror could not make the jump from Mr. Hong's assertion–that a heated stress-relief treatment should have been applied–to the finding that a reasonable person, *in similar circumstances to Vulcan*, would have used the treatment. In the absence of evidence that would allow the jury to make that finding, Mr. McLaurin's claim for negligence fails, and Vulcan's motion for summary judgment is ALLOWED as to the negligence claim.

## C. Claims against Grand Rapids

Grand Rapids contends that Mr. McLaurin's claims for negligence and breach of implied warranties against it must be dismissed pursuant to North Carolina General Statute Section 99B-2. That section provides, in part:

> No product liability action, except an action for breach of express warranty, shall be commenced or maintained against any seller . . . when the product was acquired and sold by the seller under circumstances in which the seller was afforded no reasonable opportunity to inspect the product in such a manner that would have or should have, in the exercise of reasonable care, revealed the existence of the condition complained of, unless the seller damaged or mishandled the product while in his possession . . . .

N.C. Gen. Stat. § 99B-2(a). In this case, there appears to be no dispute that Great Lakes is a "seller" within the meaning of the statute. Great Lakes and Plaintiffs do disagree, however, as to whether the U-bolt in question was acquired and sold by Great Lakes under circumstances in which Great Lakes was afforded no reasonable opportunity to inspect the U-bolt in such a manner that would have, or should have, in the exercise of reasonable care, revealed the defect in the U-bolt.

Plaintiffs, for their part, contend that Grand Rapids "embarked on a course of conduct to procure and distribute bolts, and reasonable care should include that they at least make some effort to see if the bolts are inspected." Resp. to Mots. for Summ. J. [DE-51] at p. 19. The common law, and statutory law of North Carolina, however, are at odds with Plaintiffs' contention. The general rule in North Carolina is that a non-manufacturing seller who is acting as a "mere conduit" of the product has no affirmative duty to inspect and test a product made by a reputable manufacturer, unless the seller knows or has a reason to know of the product's

dangerous propensity. *See Nicholson*, 124 N.C. App. at 68, 476 S.E.2d at 678. North Carolina courts are particularly apt to apply this rule where the alleged defect in the product is latent. *See, e.g., Sutton v. Major Prods. Co.*, 91 N.C. App. 610, 614, 372 S.E.2d 897, 900 (1988). In this case, Plaintiffs' proffered expert on metallurgy, Mr. Hong, testified that neither the crack nor the embrittlement could have been visually detected using the naked eye. In other words, the alleged defect leading to Mr. McLaurin's injuries was a latent defect. Under North Carolina law, Grand Rapids had no affirmative duty to inspect or test the U-bolts for these defects.

The facts of this case are distinguishable from *Nicholson*, upon which Plaintiffs rely. In that case, the non-manufacturing seller engaged in industry-standard visual inspections and dielectric safety tests of lineman safety gloves. The trial court allowed the seller's motion for summary judgment, but the North Carolina Court of Appeals reversed, stating a genuine issue of material fact existed as to the alleged failure of the seller to test and inspect the gloves properly. In *Nicholson*, the non-manufacturing seller undertook the responsibility to test the gloves' ability to withstand certain voltage levels. Having taken on the responsibility of testing the gloves, the seller had the duty to do so in a reasonable manner. 91 N.C. App. at 65, 473 S.E.2d at 676 ("[W]here the seller acts as more than a 'mere conduit', such as the case *sub judice* where seller performed product tests and inspections, it must do so with reasonable care."). In this case, Grand Rapids did not take on the responsibility of testing the U-bolts, perhaps because, unlike *Nicholson*, it is not "standard" in the industry for middlemen to do so. In any event, Plaintiffs cannot hold Grand Rapids responsible for something it had no duty to do: test the U-bolts for latent defects.

Even if Grand Rapids had a duty to inspect the U-bolts, the evidence does not suggest that it had a "reasonable opportunity" to discover the latent defects. As this court has detailed, Plaintiffs' proffered expert testified that the defects in the U-bolt would not be visible to the naked eye, and indeed, he could not see the crack and embrittlement until he effectively destroyed the part. The record before the court does not suggest that this creates a "reasonable opportunity" for Grand Rapids to discover the latent defects in the U-bolt.[4] Accordingly, because Grand Rapids had no duty, nor a reasonable opportunity, to perform diagnostic tests on the U-bolts which would reveal the latent defects, Plaintiffs' claims against Grand Rapids must be DISMISSED.

## D. Millie McLaurin's loss of consortium claim

Grand Rapid's motion for summary judgment is ALLOWED on Millie McLaurin's loss of consortium claim. Mrs. McLaurin's claim is derivative of the claims asserted by Mr. McLaurin. *Jones v. Southcorr, L.L.C.*, 324 F.Supp.2d 765, 783 (M.D.N.C. 2004)(holding that where employee brought suit for employment discrimination against employer, his wife's derivative claim for loss of consortium failed as a matter of law where employee's discrimination claims were dismissed). Having concluded that Grand Rapids is entitled to judgment as a matter of law on Mr. McLaurin's claims, the court also concludes that Mrs. McLaurin's claim must be DISMISSED. Because the court reserves ruling on Vulcan's motion for summary judgment on the breach of implied warranty claim, however, the court also reserves ruling on its motion for summary judgment on Mrs. McLaurin's claim.

---

[4] As discussed above, the court disregards Mr. Hong's affidavit testimony about the nondestructive testing methods.

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Reconsider [DE-35] and Defendant East Jordan's Motion for Leave to Amend Answer [DE-39] are DENIED. Defendant Grand Rapids' Motion for Summary Judgment [DE-42] is ALLOWED, and all claims against it are DISMISSED. Defendant Vulcan's Motion for Summary Judgment [DE-41] is ALLOWED IN PART with regard to Plaintiffs' negligence claims. With regard to Mr. McLaurin's claim for breach of implied warranty, he is DIRECTED to file a sur-reply within seven (7) days of the filing date of this order showing that he is an employee of the purchaser of the manhole cover in question. The court reserves ruling on Vulcan's Motion for Summary Judgment on Mr. McLaurin's breach of implied warranty claim and Mrs. McLaurin's loss of consortium claim pending receipt of the sur-reply.

SO ORDERED.

This the 27 day of October, 2009.

JAMES C. FOX
Senior United States District Judge